# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 18, 2021 Session

## COREY L. CHOATE v. AMANDA KAY CHOATE (RALSTON)

**Appeal from the Chancery Court for Bradley County**
**No. 2014-CV-42     Jerri Bryant, Chancellor**

_____

### No. E2020-01503-COA-R3-CV

_____

This appeal concerns post-divorce residential parenting schedule matters and findings of criminal contempt. Corey L. Choate ("Father") and Amanda Kay Choate (Ralston) ("Mother"), parents of daughter BC and younger son RC, divorced in 2015.[1] Some years later, Father filed a petition in the Chancery Court for Bradley County ("the Trial Court"), seeking to modify the most recently entered permanent parenting plan and to have Mother found in criminal contempt. After a trial, the Trial Court entered its order regarding the children's custody and Mother's criminal contempt. As relevant, Father was granted complete custody of RC.[2] Mother was found guilty of 573 counts of criminal contempt in connection with her failure to follow the parenting plan. Mother appeals, arguing among other things that she lacked adequate notice of the criminal contempt charges because the Trial Court failed to read the charges aloud to her in open court upon her request. We find, *inter alia*, that Father's detailed Second Amended Notice of Criminal Contempt, as well as the Trial Court's written order entered before trial specifically finding that Mother was on notice of the charges, reflect that Mother received adequate notice of the criminal contempt charges against her. We affirm the judgment of the Trial Court in its entirety and remand for an award to Father of his reasonable attorney's fees incurred on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

_____

[1] In this case, the parties refer to their children by their initials. We adopt the same approach.

[2] BC has since attained majority age. Facts concerning BC are directly relevant only insofar as they touch upon the findings of criminal contempt against Mother.

Adam U. Holland and Chanse J. Hayes, Chattanooga, Tennessee, for the appellant, Amanda Kay Choate (Ralston).

Michael E. Jenne, Cleveland, Tennessee, for the appellee, Corey L. Choate.

## OPINION

## <u>Background</u>

RC was born in April 2008; BC was born in June 2003. Mother and Father divorced in September 2015. Father was designated primary residential parent of RC, and Mother was designated primary residential parent of BC. Both Mother and Father remarried following the divorce.

In January 2017, Father filed a petition in the Trial Court to modify the parenting plan and for criminal contempt. Following mediation, the Trial Court entered a mediated amended final order incorporating a new parenting plan which kept the primary residential parent designations as they were but provided for essentially 50/50 co-parenting time. Attorney Meghan Bodie ("Bodie") was chosen to serve as "parenting coordinator." Bodie's role was to resolve differences between the parties on disagreements over the parenting plan. Some key provisions of the plan were that the parents would not speak badly of one another and were to notify one another of the children's upcoming activities. Educational decisions were to be made jointly. Mother was to have the children on Monday and Tuesday. Father was to have the children on Wednesday and Thursday. Mother and Father were to alternate every other weekend.

In October 2018, Father filed another petition for modification and criminal contempt. Father sought to be designated primary residential parent of BC. Father also sought to reduce Mother's co-parenting time with RC. Father alleged that Mother had not allowed him to co-parent BC since mid-2017. In response, Mother filed a motion to dismiss. Mother also sought precision from Father as to the exact times, dates, and locations of her alleged acts of criminal contempt. Father's notice of contempt underwent multiple iterations. In February 2019, in response to a number of motions filed by Mother, Father filed his Second Amended Notice of Criminal Contempt. This 18-page document set out 592 allegations of criminal contempt in detail. It also warned Mother that she faced a fine or jail time for each count.

In March 2019, the Trial Court entered an order addressing various motions filed by Mother. Mother's motion to dismiss the Second Amended Notice of Criminal Contempt was denied. Most significantly for purposes of this appeal, the Trial Court found that Mother received adequate notice of the charges against her. Mother's request for discovery

was denied as the Trial Court held that the criminal contempt proceeding was not a criminal proceeding such that would trigger general application of the Tennessee Rules of Criminal Procedure. Mother's request that the charges against her be read aloud by the Trial Court in open court likewise was denied. In its order, the Trial Court stated, in part:

> 7. Respondent's request for the Court to read the Notices of Criminal Contempt Proceedings to the Respondent orally in open Court pursuant to Rule 42 of the Tennessee Rules of Criminal Procedure is denied. The Court finds that the Respondent has been provided the Notices of Criminal Contempt Proceedings, she has knowledge of the criminal charges against her, and the Respondent's counsel is further capable of reading the Second Amended Notice of Criminal Contempt Proceedings to the Respondent.

In its oral ruling attached to its order, the Trial Court stated, as pertinent:

> THE COURT: Sure, you can give me the *Creighton* case. And then I want you to give me one that says in a civil hearing a petition for criminal contempt is not -- I mean, is I'm supposed to stand here and read thirty pages out loud to her when she's got a lawyer who's perfectly capable of reading those things to her.
> MR. HOLLAND: Your honor, you're the gatekeeper as to --
> THE COURT: Denied. Okay, we'll deny it. I'm not going to read it out loud to her.
> MR. HOLLAND: Okay. Fair enough, --
> THE COURT: So, there's you an issue.
> MR. HOLLAND: -- we're on record.

Mother filed an answer and counter-petition alleging that Father was in contempt of court and that a substantial and material change of circumstance had occurred since the January 2017 mediated amended final order.

Trial in this matter began in June 2019, and took place over the course of nine non-consecutive days through September 2019. We will review testimony from trial germane to the issues raised on appeal. Among the witnesses to testify was Father. Father stated that Mother had, in effect, cut off his coparenting time with BC. Father also stated that Mother failed to communicate with him regarding BC's activities as required under the parenting plan. BC is a champion barrel racer and horse rider. Father testified his relationship with BC spiraled after he and his wife Kristina went to one of BC's races in March 2017. Father stated that Mother berated him in front of BC at that event. Father testified about the March 2017 incident, which he asserted was the turning point in his relationship with BC:

Q.  Before March of 2017 was [BC] showing affection toward you and Kristina?

A.  She was.  She was starting to open up.  Some of the -- we would always -- you know, Snap Chat has funny faces.  And [BC] actually friended Kristina on Snap Chat.  We would use the funny faces and the funny hair on the way to school every morning and send each other messages back and forth on Snap Chat.

Q.  So what happened -- in your petition we talked about A.  Now, we're going to Part B of your petition.  What happened on March 17th, 2017?

A.  So things was really good.  [BC] and I actually had a conversation a little bit before that about coming to the barrel race.  I said, you know, me and Kristina are going to come to some of your barrel races.  She was fine with that.

The weekend before [BC] had a barrel race in Calhoun, Georgia, which was local.  At the time I was working weekends so it was easier to attend local ones.  Mandy [that is, Mother] failed to send an activity email so I sent an activity email to the parent coordinator and said, hey, I need to know about these barrel races.  The parent coordinator responded and said, Mandy, you need to send activities.

So the very next Friday -- Friday the day before the barrel race in Calhoun on Saturday, Mandy she sent an email and said, [BC] has a barrel race [in] Calhoun.  I'm sorry.  She sent it on Thursday.  The barrel race was on Friday night.

Q.  Was this at the Stacy Layne Arena in Calhoun?

A.  Stacy Layne Arena.  So I told Kristina, I said, let's run down and watch [BC] run.  There's a Longhorn's there and we'll have dinner at Longhorn's.  She said, okay, that's fine.  So we went down to the barrel race.  And I said, I don't really want to cause any confrontation with Mandy.

Let's go in.  We'll watch [BC] run.  I'll speak to [BC].  Say, hi, and we'll leave.  I was very reluctant.  I made sure I didn't go over to the horse trailer to cause any type of confrontation.  I wanted to watch [BC] run, tell her good job and leave.  So I did that.

So we went in.  I went to the announcers stand to see what [BC's] run numbers was and about what time she would run.  And I got that information and then [BC] ran her horse.  Once [BC] ran her horse Kristina and I went to leave.  When we went to leave, Mandy was on the other side of the arena.  She came barreling up to us on a horse, slid the gravels and started saying, you don't belong here.  Why did you bring that…

Q.  You can say it.

-4-

A. Why did you bring that whore here. You-all don't belong here. [BC] don't want you here. She hates you. Just on and on and on. And she chased us all the way to the car on her horse. We left.

So we went to Longhorn's to eat and less than an hour after that [BC] sends me a text message saying all of them same things.

Q. So up until this barrel race on March 17, 2017 had things been good?

A. Things were very good.

THE COURT: Was the child there when the mom was saying those things?

THE WITNESS: Yes.

Q. (By Mr. Jenne) Did [BC] see what happened and hear what [Mother] told you as you described?

A. [BC] was within 30 feet.

Q. And what did she do? What was [BC's] demeanor? What was her actions?

A. She just started walking the other way.

Bodie, the parties' parental coordinator, testified as well. With regard to her communications with Mother and Father over the latter's parenting time with BC, Bodie stated:

Q. (By Mr. Jenne) And did you tell [Mother] that it was her responsibility as the parent to make sure that [Father] got his coparenting time?

A. I did.

Q. On several occasions?

A. Yes, sir.

Q. And was [Father] constantly communicating with you directly up until May of 2018, June of 2018, you know, I want to coparent. Do you have any suggestions about how I can get my coparenting?

A. He did. And I believe I told him at some point, you know, I can't make [BC] go and I can't make [Mother] make [BC] go so you may just have to go back to court. And that conversation probably started in the fall of 2017.

Q. Did [Father] make you aware that he would go pick up [RC] and wait in the driveway for extended periods of time for [BC] to come out to coparent, she wouldn't come?

A. I knew that because I was also getting emails about that kind of in real time. So if they were exchanging, one of them would say, I'm leaving and the other one -- then when they got to the residence where they were picking up the child or children they would say, I'm here. And so it was an email so I was kind of getting it in real time. Like I've been here for ten minutes or I'm waiting in the driveway.

-5-

Q. Has [Mother] ever communicated to you that she wished that [Father] would just give up his parental rights and move on?
A. She expressed that she -- yes. That Mr. Ralston [now Mother's husband] was more of a father to [BC]. Yes.

Dr. William Bernet ("Dr. Bernet"), a graduate of Havard Medical School and a child/forensic psychiatrist, testified as an expert for Father. Dr. Bernet had testified in a number of states as an expert witness on the phenomenon of parental alienation. Mother's counsel requested that the Trial Court disallow Dr. Bernet from testifying as an expert. The Trial Court denied the request.

Dr. Bernet had not evaluated either RC or BC. Instead, he was asked a series of questions about whether certain actions by Mother and BC appeared to be consistent with parental alienation. According to Dr. Bernet, "[p]arental alienation refers to a psychological condition in which a child aligns himself or herself strongly with an alienating or a preferred parent and rejects her relationship with the alienated or targeted parent without legitimate justification." Dr. Bernet testified that five factors indicate parental alienation: (1) the child manifests contact refusal; (2) the existence of a prior positive relationship with the rejected parent; (3) absence of abuse, neglect, or highly deficient parenting; (4) the alienating behaviors of the preferred parent; and (5) symptoms of parental alienation in the child. Guided by these factors, Dr. Bernet testified that the facts presented in this case were consistent with severe alienation of BC toward Father at the hands of Mother.

Dr. Bernet also testified to certain examples of alienating behaviors of the preferred parent, as follows: (1) denigrating the other parent; (2) limiting the child's contact with the other parent; (3) interfering with communication between the child and other parent; (4) voicing disapproval when a child shows affection to the other parent; (5) allowing the child to choose between her parents; (6) creating an impression that the other parent is dangerous or evil; (7) referring to other parent by first name; (8) referring to the stepparent as mom or dad and encouraging the child to do so; (9) withholding information from the other parent and keeping the other parent's name off records; (10) changing the child's name in certain settings to remove association with other parent; (11) confiding to a child about adult matters regarding the divorce and the other parent; and (12) undermining the other parent's authority and cultivating dependency. Dr. Bernet stated that Mother's actions as described were consistent with these factors.

In addition, Dr. Bernet testified to eight factors indicating symptoms of parental alienation: (1) a child's "campaign of denigration" against the parent; (2) frivolous rationalizations for the child's criticisms; (3) a lack of ambivalence (i.e., one parent is totally good and the other totally bad); (4) independent thinker phenomenon (i.e., the child

says "I thought of this on my own"); (5) reflexive support of the preferred parent; (6) an absence of guilt over the exploitation of the rejected parent; (7) borrowed scenarios (i.e., the child says the same things as the preferred parent); and (8) spread of the child's animosity toward the rejected parent's extended family. Dr. Bernet testified as follows about RC's risk for parental alienation, as well as about the Family Bridges treatment program for cases of parental alienation:

> Q. … We've talked primarily about [BC] but I want you to assume that the facts have been -- we talked about it a little bit. But the facts have been that mother tells [RC] you don't love me. Mother calls father F'ing stupid in front of [RC]. Mother doesn't take [RC] to his scheduled activities. Mother plans sports events on father's time. Are these consistent with alienating factors from mother on behalf of [RC]?
> A. Yes, they are consistent with that. They don't sound as pervasive as what has happened with [BC] but they're certainly consistent with alienation.
>
> ***
>
> Q. Tell the Court about Family Bridges and your past involvement and experiences with Family Bridges.
> A. Well, I know about it because I've read about it and I know some of the people who are the treatment personnel. I've never actually done -- I've never had the training. I've never been employed by them. I've never sort of done a project directly with them but I am aware. And I've heard some of their presentations.
> The basic program consists of four days. It consists of an intervention where the children and the target parent go to a location that's usually a fun location. Sometimes it's a resort but it's a place where there are things to do….
> So the overall scheme is that the children are removed from the source of the indoctrination. They're given an opportunity to interact in a healthy way with the previously rejected parent and they're given education about how people develop false beliefs. And in their case it's how did they develop a false belief about mom and dad and there may be other family members. So that's an overview….
> The other component is that the preferred parent or the alienating parent is removed from the picture for a period of time.

Dr. Bernet stated his understanding was that the minimum time period a child is removed from an alienating parent is 90 days.

Mother testified. Mother acknowledged making online posts referring to her husband, rather than Father, as BC and RC's dad. Mother testified that, in her view, this was good and appropriate parenting. Mother testified further that in 2017, she got BC a new phone with a new number but failed to tell Father the number. She eventually revealed the number during a deposition. Mother also stated that when Father called her phone, a picture of a jackass popped up on the phone. Nevertheless, Mother acknowledged that Father was a good father to RC. Mother stated that she filed a counter-petition seeking to reduce Father's parenting time with RC to 80 days per year simply for "retaliation." Mother denied Father's account of the March 2017 incident. She stated that BC's estrangement from Father began well before March 2017. Mother testified to what changed in terms of BC no longer going with Father on his coparenting time:

Q. So from your perspective [Father's] relationship with BC from 2016 up until this March 17th, 2017 barrel race, the relationship was good?
A. The relationship was tolerable. The relationship was tolerable because [BC] had to go. I made [BC] go and I told [BC] she had to go.

Mother also testified at length to her view regarding whether she should be bound by a parenting plan:

Q. You testified on direct examination -- I wrote it down -- quote, I do not want to live by the parenting plan. I do not want to be micromanaged. Do you remember testifying to that?
A. Yes, I do testify to that. I don't want to live by a parenting plan.
Q. You just want to do what you want to do, don't you?
A. No. Absolutely not. That's your words.
Q. But the parenting plan controls, correct?
A. The parenting plan is a guideline that we should all follow but life is not written in black and white. Situations arise in life that you have to be able to be an adult about and arise above that that's written down and be able to parent together and coordinate together and coparent together on situations that come up.
    Because not every barrel race, not every basketball game or baseball game is written in that parenting plan. It's not there. So there's going to be times and issues that you have to go outside of that parenting plan.
    And me and Corey have got to grow up and realize that that piece of paper does not need to raise our children. We took it upon ourselves to have kids together and we took it upon ourselves to raise these kids the best that we can. We're both human and we're both going to make mistakes. I'm sure you can agree with that. You're human, you make mistakes. Everybody here does.

But that parenting plan is a guideline to help two people who all of a sudden can't get along because of the rift that's happened between the marriage. But that parenting plan is just a piece of paper. It's a piece of paper.

On January 7, 2020, the Trial Court entered its immensely detailed, 72-page order, which incorporated a permanent parenting plan. The Trial Court found that both Mother and BC lacked credibility. The Trial Court found RC's testimony unhelpful and that he sounded as though he had been influenced by Mother. The Trial Court found Mother in criminal contempt on 573 charges of failure to abide by the parenting plan. The Trial Court stated "[t]his case is the most disturbing case and the most severe alienation case this Court has seen in twenty-one (21) years." The Trial Court found and held, in part:

After testifying about knowingly waiving her Fifth Amendment Right against self-incrimination and recognizing that she is facing close to 600 counts of criminal contempt, Mother then began to testify about her parenting. She testified she co-parents to the best of her ability. According to her, she has been to all of RC's events, coached basketball, and been to all football and basketball games. This is not supported by her emails. She has tried to interact with Father, but he does not want to interact with her. There is no communication. If she tries, there is embarrassment. Father will only email or text her. The last time she tried to talk to him in person was at the East Brook football game in the Fall of 2018. She explains that she was at the football game and on the phone when she heard someone talk about hitting RC. She thought they were intentionally trying to hurt her child. In response to the coach saying "hit him," she began to holler at her child saying "good job." She walked toward the team and another coach told her to "go sit down and shut up." She argues with him that she was not doing anything but testified she went back to her chair. When other parents came around and complained, she laughed and at the end of the game she admits walking over toward Father and RC. She testified Father made a scene with the referee so she told RC to "come on." She was upset because she felt Father did "not respect" her while she was only trying to tell him what happened. Because Father would not talk to her, she approached the assistant coaches and told them she deserved the same amount of respect as everyone else. The next day she proceeded to call the Whitfield County Recreational Department and complain about the disrespect she received from the assistant coaches. She complained that Father will not talk to her in public and will only send her emails. She denies using profanity, denies berating Father because "he is notorious for recording and taking pictures." However, she admits she cursed him throughout the divorce proceedings. Mother tries

-9-

to draw people into conflict and makes things, she perceives as a slight, much bigger than they really are. She is confrontational. She blamed Father for her inability to coach RC even though she was gone with BC at the period of sign-up. She finally admitted she was unable to coach RC's teams because BC is on an elite level of racing that requires a lot of her time.

***

The fact Mother has very little to no insight on how her behavior is inappropriate, is not in the best interest of the child, and a central problem in this case. When asked what she could have done differently, Mother paused for a long period of time. She then began to blame others. She testified Father did not put forth an effort and did not reach out to the child. She did not know how she could have done anything to make the situation any better. It is all Father's fault. She admits she did not "go stand over the top of the child and force the child to go visit her father." She testified, incredibly, that she sent the child out every time the father came to pick up the children. This is completely unsupported by any evidence. After being pushed a little further by the Guardian Ad Litem, she admitted she could have punished BC for not going, but she absolutely refuses to take the horses away in order to get the child to conform her behavior. "I am not going to do that" she said "not on my time." "I am not going to take the only thing that drives her." "I don't know why she won't go over to Corey's house." "I am not there to assess it," "it is not done in front of me so I can't assess it" (completely impeaching her earlier statements).

***

Mother's demeanor during this trial was disrespectful, at times. She would often talk to her attorney in, what appeared to this Court to be, an angry manner. At times, she would make annoyed faces/smirks at the witnesses. She was angry on the stand when she testified she thought Father's attorney was being disrespectful to her as he asked her questions. While she accused him of having a disrespectful and sarcastic tone, she exemplified a disrespectful and sarcastic tone. She felt like Mr. Jenne was not affording BC the proper respect for the accomplishments she has made in barrel racing.

***

-10-

Mother also called her son, RC, as a witness. The child was very hesitant to talk about his parents. He testified his mother has talked to him about her embarrassment at his football game. He testified the divorce made his mother angry and it was clear the child did not want to testify. He testified his step-mom yells at him sometimes and it appears from the child's demeanor on the stand that he has been pushed into testifying in a way that appeals to Mother. He testified his mom does not discipline him and his dad does not get upset with him. He testified both parents take privileges away to discipline him. He described it as "weird" that his dad looks at his mom "like he is scared of her." This certainly confirms Father's testimony. The child appears to be coached more than most children the Court sees on the stand. RC testified he understands his sister is mad, but he cannot control her. He finds it confusing that BC calls Mr. Ralston "dad" and Father "Corey." On cross-examination, the child admits it is more strict at his dad's house and his dad has more rules. He understands both of his parents love him and he loves both of them. He testified he has seen his mother get upset when he has been with her, but he does not want to voice an opinion about her temper. He testified it "depends on the situation." The child bolstered Father's testimony by stating there were times when BC was happy at Father's home. While he was hesitant to admit he and BC had gone to Dollywood when they were with Father[,] [h]e admitted that in December 2016, he, BC, Father, Kristina, and the family were in Gatlinburg together and all had a good time. He admits BC is in some of the pictures that were shown to him and that she was having a good time. This bolsters Father's testimony and Kristina's testimony that establishes that between August 2016 and March 2017 BC was getting along with her father and step-mother. While RC is hesitant to admit he was having a good time, he does admit BC was having a good time. This further shows that he is nervous to testify, about his father, in a positive way in front of his mother. It also shows to this Court what could be the beginning of parental alienation by Mother. The child's voice got very quiet when he was asked if he had a good time in some of these pictures. He did remember BC coming over and having a good time at Father's house. RC admitted his father can get angry and might yell louder than Mother, when he says things like "My God." He testified he is afraid of his father because of the time it "looked like" his dad hit BC. There is no proof of this. RC did not see it. He testified he felt this because his mother showed him a video of it. She is, therefore, the one who made him feel that way. At times, RC cannot remember some key facts about his mother, but then remembered his mother coached basketball one time, but quit because she could not get the players she wanted. This was approximately winter of 2017. He testified he has not heard Kristina talk about his mother. RC's

testimony was not very helpful to this Court because it appeared to be influenced by Mother. His testimony did provide insight about his sister.

*** 

BC fits with Dr. Bernet's description of severe alienation. Father has been deprived of his fundamental right to parent his child by his ex-wife. He has missed over 365 days of parenting time with the child. Because of the timing of the petition for contempt, this has resulted in at least 297 incidents of contempt. These have continued after the filing of the petition. There would be more as BC is still not visiting. This Court cannot condone Mother's behavior. She has willfully and defiantly violated this Court's orders. She has refused to cooperate with Father and require BC to visit him. She has spoken badly to and about Father and other members of his family and violated the permanent parenting plan by: (1) failing to comply with Paragraph J and failing to do the Sunday email of the children's activities for the coming week and within five (5) days of any change notifying the other parent of that change (at least 75 times); (2) failing to meet with [Meghan] Bodie, the parenting coordinator; (3) failing to follow the parents' rights pursuant to T.C.A § 36-6-601 and incorporated in the parenting plan; (4) by failing to provide unimpeded telephone contact with the child at least two (2) times per week. Mother has deprived Father the right to receive directly from the child's school any educational records so he could receive information. Mother has failed to recognize his right to be free from unwarranted, derogatory remarks made about him or his family to or in the presence of the child. She has failed to give him at least forty-eight (48) hours notice of all extracurricular activities with enough information so he could participate. Mother has refused to cooperate with Father such that he did not receive any of his summer co-parenting time. Additionally, Mother has violated Paragraph 1 of the parties' parenting plan by failing to encourage BC to continue to love her father and be comfortable in both homes. Mother has refused to follow all recommendations set forth by the parenting coordinator. Mother has called Father and his fiancée, now wife, inappropriate names, promoting BC's disrespectful and inappropriate behavior in violation of the parties' permanent parenting plan. Mother has, on at least sixty-two (62) Sundays, between May 2017 and December 2018, failed to send the Sunday email in violation of the parties' permanent parenting plan, Paragraph J(i), page 3.

Mother has, as found above, failed to consult with Father, who has joint educational decision making and removed BC from school without his permission. Father has been prevented from speaking with the child at least

-12-

twice per week since March 19, 2017, this is in violation of the parties' parenting plan and parental bill of rights. This has resulted in at least one hundred ninety-six (196) incidences of contempt through January 7, 2018. The Court finds Mother's behavior seriously jeopardizes the health, safety, and general welfare of the minor children.

\*\*\*

The Court finds there has been a substantial and material change in circumstances, such that it is in the best interest of the children for Father to become the primary residential parent of both children….

\*\*\*

All incidents of contempt are found beyond a reasonable doubt. Father has missed more than one year of co-parenting time with his child, who is quickly approaching the age of eighteen (18). This may be Father's last chance to salvage a relationship with the child. Because Mother has shown no desire to follow the Court's Orders, nor repair the relationship with BC and Father, the Court finds her attitude, demeanor, and conduct such that circumstances have been detrimental to BC and there has been a material change in circumstances that this Court finds it is in BC's best interest for Father to have full custody of her. The Court further finds it is equitable that Father be allowed to make up as much of the time he has missed with BC as possible, and he will therefore, have the next one hundred twenty (120) days of co-parenting time with both children, uninterrupted by Mother. After this period, Father shall have the children full time and Mother will have them every other weekend. This will begin only after she successfully completes the counseling with Heidi [Kilmer] as part of the Family Bridges Program. She will be allowed two-nonconsecutive weeks in the summer if she successfully completes counseling.

\*\*\*

Additionally, the Court finds RC is in danger of the same alienation suffered by BC at the hands of Mother. The Court grants Father complete custody of RC. All decision making concerning both children will be vested with Father.

\*\*\*

-13-

The Court further finds it was appropriate to appoint a Guardian Ad Litem in this case because of the circumstances and needs of the child, including the child's age and developmental level; because of inappropriate adult influence or manipulation of the children; because of the higher than normal level of acrimony indicating at least one of the parties' lack of objectivity concerning the needs and the best interest of the child, and because of the interference with custody, access, and visitation and/or parenting time by Mother. The behaviors in this case arise because of the actions of Mother and, therefore, the Court will assess all Guardian Ad Litem fees to Mother. The Court finds the Guardian Ad Litem in this case has participated in the proceedings, has met with BC, and has performed his functions as was asked by this Court.

Factors under T.C.A. § 36-6-404 have been discussed in this Order. The Court finds that Father is capable of providing for the children's changing needs as they grow and mature. Mother is not capable of recognizing the children's changing needs as they relate to Father. Removing the children from Mother will hopefully minimize the children's exposure to harmful parental conduct.

Regarding the factors under T.C.A. § 36-6-406(a), the Court finds Mother's neglect or substantial non-performance of the parenting responsibilities relating to Father have been detrimental to the children. Mother has an emotional impairment that interferes with her performance of parenting responsibilities. The Court finds no proof of drug, alcohol, or other substance abuse in this case. The Court finds there is substantial impairment of emotional ties between Father and BC. The Court finds there has been abusive use of conflict by Mother that creates the danger of damage to the children's psychological development. The Court finds Mother has withheld from Father, access to BC for a protracted period of time, without cause.

Like _McClain v. McClain_, 539 S.W.3d 170 (Tenn. Ct. App. 2017), this Court heard disturbing testimony from a child who has a real problem with empathy. In that case, the Court awarded the mother the right to take the children and participate in the Family Bridges Program. However, it appears that in this case, the effect on BC, in some ways, is more extreme than in _McClain_. Like _McClain_, Mother and BC both feel like Mother is always right and Father is always wrong.

This Court recognizes Father had problems with BC prior to the entry of the divorce decree. The Court had ordered Mother to proactively work on those issues. Those problems had improved in late 2016 through March 2017. Both parties agreed in January 2017 to equal co-parenting time with the children. Certainly, after the March 2017 incident, the alienation grew

-14-

exponentially.  By the time Father filed his petition, the child was refusing to see him at all.  This was not the case prior to his filing of the petition.

The Court views this as the last chance for Father to have a relationship with his daughter.  It is also the last chance to potentially alleviate long-term, harmful effects of parental alienation to the children.  While the Court does not find specifically that RC has been alienated from his father, the Court does find Mother's attempts have begun.  Certainly, when children have healthy development they have empathy and can appreciate another person's state of mind and emotional experience.  Clearly, BC does not seem to have that ability when it comes to her father.  Under *McClain* and under this case, when a parent is supporting alienation, it effectively supports the child in cruel, unempathetic behavior towards another human being.  The Court finds Mother is supporting the child "in attitudes and behaviors towards interpersonal conflicts that emphasize rejection, separation, and polarization rather than resolution."  Parental alienation is a risk to normal personality development as it undermines critical thinking skills.

***

Based on all of the above, it is ORDERED, ADJUDGED and DECREED that Mother is hereby found in contempt for at least 573 violations of this Court's previous Orders.  These consist of:

(1) The absence or incompleteness of the Sunday emails at least 62 times between May 2017 and December 2018.
(2) 297 missed co-parenting days between May 2017 and December 2018.
(3) Failure to consult about school.
(4) Failure to give school information.
(5) Unwarranted derogatory remarks by Mother (at least 3 times).
(6) Mother has failed to behave toward Father so as to provide a loving, stable, and nurturing relationship with the children at least 1 time on March 17, 2017 at the arena in front of BC.
(7) Mother is in contempt of court for failure to provide Father with a phone number of BC, so that pursuant to the parenting plan, Father could have two (2) phone calls per week with BC (at least 208 incidents of contempt).

-15-

The Court further finds it is in the child's best interest to interrupt the child's "career" for a period of one hundred twenty (120) days to attempt to repair the relationship between Father and BC through Family Bridges and the aftercare intensive program, it is

ORDERED, ADJUDGED and DECREED that Mother shall produce BC and RC to Father on January 21, 2020 at the Bradley County Sheriff's Department at 12:00 p.m., for the children's participation in the Family Bridges Program with Father. Mother is ORDERED to cooperate with the exchange and make BC and RC cooperate. Should Mother fail to appear with the children on the 21st day of January 2020 at 12:00 p.m. at the Bradley County Sheriff's Department, an attachment shall issue for her arrest.

It is further ORDERED Mother is to begin her intensive treatment with the recommended counselor, Heidi Kilmer, immediately and upon her release from jail.

The Trial Court further dismissed Mother's counter-petition, as "[Mother] admitted she only filed the same in retaliation of Father's petition." Mother's time with the children was to be based upon Mother and BC's compliance with the Family Bridges Program Guidelines and the rules and recommendations of the after-care professional, to begin after 120 days of no contact and successful competition of the Family Bridges Program by Mother and BC. Mother was fined $50 for each finding of criminal contempt for a sum of $28,650. The Trial Court sentenced Mother to 200 days in jail—ten days for the first twenty instances of contempt, which would run consecutively. The remaining 553 instances of contempt were to run concurrently. The Trial Court found Mother's sentence was "justly deserved." Mother also was ordered to take an anger management class. Father filed an application for attorney's fees and expenses. In February 2020, the Trial Court entered a judgment in favor of Father in the amount of $82,826.76.

Meanwhile, a separate legal process was unfolding in the state of Georgia, where Mother lived with her husband. BC filed a petition seeking her emancipation. Father contested this petition in Georgia. On January 17, 2020, the Juvenile Court for Whitfield County, Georgia ("the Georgia Court") entered an order granting BC's petition for emancipation. In reaching its decision, the Georgia Court acknowledged the Trial Court's January 2020 custody order in Tennessee but held that the "provisions of the Uniform Child Custody Jurisdiction and Enforcement Act [the UCCJEA] are not applicable to this Court's determination on the issue of the Petitioner's emancipation." The Georgia Court ruled that emancipation proceedings are not "child custody proceedings" subject to the UCCJEA. The Georgia Court found that BC was a resident of the state of Georgia. The Georgia Court stated that "[e]ven if Petitioner is a 'resident' of the State of Tennessee through the Bradley County Order executed on January 7, 2020, six days prior to the hearing in this case, the fact that she was undoubtedly a Georgia resident at the time of filing of her

-16-

Petition for Emancipation controls and this Court continues to have jurisdiction over the matter." The Georgia Court found that "[t]he Mother and Father's continuing legal issues surrounding Petitioner's custody … are of such a contentious and volatile nature that it is in Petitioner's best interests to be emancipated by Order of this Court, so that Petitioner is removed from further entanglement in the Mother and Father's legal disputes." The Georgia Court further found that BC was uniquely situated to manage her financial affairs as she is a "world-class horse trainer, racer, rehabilitator and instructor." BC's income for 2019 was expected to be over $100,000. The Georgia Court stated that BC expected to enroll in college on a full scholarship. BC had a Georgia driver's license, and intended to live in a residence belonging to her grandmother should she be emancipated.

In March 2020, the Trial Court entered an order addressing the impact of the Georgia emancipation proceedings. The Trial Court stated:

> [Father] seeks enforcement of this Court's January 7, 2020 Order and requests this Court not recognize the Georgia emancipation order.
> [Mother]'s response contends that Plaintiff's motion to make additional findings is untimely, and therefore this Court would lack jurisdiction to grant such a request. While this Court entered an order dated January 7, 2020, it did not fully adjudicate all the rights and responsibilities of the parties. There remained the issue of setting the amount of attorney fees to which [Father] was entitled. Emancipation proceedings under T.C.A. § 29-31-105 "removes the disability of the minor so as to enable the minor to do some particular act…empower the minor to do all acts in reference to the minor's property, making contracts, suing and being sued, and engaging in any profession or vocation the minor could do if they were eighteen (18) years of age"; such an act, as was found in the Georgia Order does not make legal custody or physical custody of the child "an issue."
> Therefore, whether or not the child in this situation has been emancipated is of no legal consequence in the State of Tennessee and the emancipation of the minor does not affect the custody case in Tennessee. Therefore, it is immaterial whether this Court recognizes the child's emancipation. The child is still a child involved in a custody case in Tennessee. The custody of the child is controlled by the laws of the State of Tennessee and the Orders in the State of Tennessee.
>
> ***
>
> The Court treats [Father's] post-trial motion as asking if he has authority to request this Order to enforce its order [sic] given the

-17-

emancipation. This Court has explained its views of the emancipation order entered out of the Georgia court and clarified its order.

This Court hereby finds the issue of contempt as final in this matter. The issue of attorney fees was decided on February 27, 2020. The Court finds that based upon this Court's custody order, [BC] was not a resident of the State of Georgia at the time the Georgia emancipation order was entered; however, this Court further finds the emancipation of this child does not affect this Court's custody order.

In July 2020, Mother filed her verified petition for custody modification and for arbitration. In August 2020, Mother filed her motion to refer the case to arbitration and motion to allow communication with the child. Father filed a response asserting that Mother had taken no actions to comply with the Trial Court's January 2020 order and parenting plan. After a hearing, the Trial Court granted Mother's request that Father resume his weekly emails to Mother as had been the practice under the old parenting plan. Father filed a motion to dismiss Mother's verified petition for modification, asserting she failed to allege any material change of circumstance since the January 2020 order was entered. Mother's petition alleged, in part:

A substantial and material change in circumstances exists that warrants modification of the current custody Order with regards to [RC] where [BC's] emancipation in the state of Georgia, and Father's decision to not appeal or otherwise challenge the emancipation Order in the state of Georgia makes implementation of the current custody Order and the Family Bridges protocol impossible.

Mother requested, among other things, that she be allowed to talk to RC on the telephone; have overnight visitation at least every other weekend and shared holidays; and that an independent expert be appointed to conduct a clinical evaluation of RC to determine if he suffered emotional harm from being denied contact with Mother.

In October 2020, the Trial Court entered an order granting Father's motion to dismiss Mother's petition. In its oral ruling, which was incorporated into its order of dismissal, the Trial Court stated in part:

Armbruster [sic] says a material change of circumstances can be based on changes that could have reasonably been anticipated. However, I don't believe Armbruster goes so far as to say that when a person is not following the court orders, and is basically in contempt herself, and has been found in contempt on several other issues, that that in and of itself can create a material

change of circumstances.  Mom's conduct cannot create the material change and ask for relief from a court order that she does not intend to follow.

Mom's conduct in the past has been found to be detrimental to both children.  Mom was ordered in the divorce case to fix the relationship with [BC] and she did not.  She was further ordered to begin her intensive treatment with Heidi Kilmer on Page 68 of this Court's order of January the 7th, 2020.  She has not.  This was to hopefully keep her from completing the alienation that she had begun and thereby harming [RC] as well as help mend the alienation she created with [BC].

Based on the above, the Court finds that mom is coming into court with unclean hands.  That she has failed to allege a material change of circumstances and that this Court is denying her motion, her petition….

Father filed an application for attorney's fees and expenses.  In November 2020, the Trial Court entered a judgment in favor of Father in the amount of $7,147.50 for his attorney's fees and expenses.  In January 2021, the Trial Court entered an amended and supplemental order on Father's application for attorney's fees and legal expenses.  Mother timely appealed to this Court.  By order of this Court, Mother's appeals from the January 2020 order on contempt/custody and the October 2020 order dismissing her petition for modification were consolidated.

## Discussion

We restate and consolidate Mother's issues on appeal as follows: 1) whether Mother failed to receive adequate notice of the criminal contempt charges brought against her; 2) whether the 573 counts of criminal contempt found against Mother were proven beyond a reasonable doubt; 3) whether Mother's sentence of 200 days in jail and a fine of $28,650 was excessive; 4) whether the Trial Court erred in finding that parental alienation existed in the absence of a clinical evaluation of either parent or RC and on the basis of unreliable expert testimony; 5) whether the Trial Court erred in finding a material change of circumstance as to RC; 6) whether the Trial Court erred by failing to conduct a proper best interest analysis for RC; 7) whether the Trial Court erred in dismissing Mother's post-trial petition for modification; and 8) whether the Trial Court abused its discretion in granting Father attorney's fees.  Mother also raises an issue concerning whether the Georgia emancipation order supersedes the Trial Court's order granting Father full custody of BC.  However, this issue, along with any issue raised by Mother concerning BC's disposition, is moot as BC is now an adult.  Facts concerning BC are relevant only to the extent that they touch upon issues of Mother's criminal contempt.  Father raises a separate issue of whether he should be awarded his attorney's fees incurred on appeal.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Regarding witness credibility, our Supreme Court has stated:

> When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ⸺ U.S. ⸺, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014). Insofar as the abuse of discretion standard is implicated, our Supreme Court has explained the abuse of discretion standard as follows:

This Court has described the abuse of discretion standard in some detail:

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. Thus, it does not permit reviewing courts to second-guess the court below, or to substitute their discretion for the lower court's. The abuse of discretion standard of review does not, however, immunize a lower court's decision

-20-

from any meaningful appellate scrutiny.

> Discretionary decisions must take the applicable law and the relevant facts into account. An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

*Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citations omitted); *see also BIF, a Div. of Gen. Signals Controls, Inc. v. Serv. Const. Co.*, No. 87-136-II, 1988 WL 72409, at *2 (Tenn. Ct. App. July 13, 1988) (citations omitted) ("The standard conveys two notions. First, it indicates that the trial court has the authority to choose among several legally permissible, sometimes even conflicting, answers. Second, it indicates that the appellate court will not interfere with the trial court's decision simply because it did not choose the alternative the appellate court would have chosen.").

*Lee Medical* provided the framework for determining whether a trial court has properly exercised its discretion:

> To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions.

*Lee Med.*, 312 S.W.3d at 524-25 (citing *Flautt & Mann v. Council of City of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF*, 1988 WL 72409, at *3)); s*ee also Vodafone Americas Holdings, Inc. & Subsidiaries v. Roberts*, 486 S.W.3d 496, 514 (Tenn. 2016).

*Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 305-06 (Tenn. 2020). "A trial court abuses its discretion only when it applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining. The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court." *Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 294 (Tenn. 2017) (internal quotation marks, brackets, and citations omitted).

We first address whether Mother failed to receive adequate notice of the criminal contempt charges brought against her. In her brief, Mother asserts as to this issue, in part: "The trial court's refusal, upon Mother's request, to read the counts of criminal contempt to Mother in open court due to the multiple pages of the pleading was evidence of Father's failure to plainly and succinctly set forth the 'essential facts' to support Father's allegations that Mother was guilty of criminal contempt." Mother argues that the Trial Court abdicated its role as "gatekeeper"; that Father improperly "weaponized" criminal contempt against Mother; that Mother was deprived of due process; and that Mother failed to receive adequate notice of the criminal contempt charges against her. Specifically, Mother argues that the Trial Court should have read the charges aloud to her in open court upon her request.

To determine whether Mother's contentions are correct, we look to the law on criminal contempt in Tennessee. This Court has stated: "An issue regarding the sufficiency of notice provided regarding criminal contempt allegations presents a question of law, which we review *de novo*. However, a trial court's use of its contempt power is within its sound discretion and will be reviewed by an appellate court under an abuse of discretion standard." *McClain v. McClain*, 539 S.W.3d 170, 187 (Tenn. Ct. App. 2017) (internal quotation marks, brackets, and citations omitted). Tenn. R. Crim. P. 42(b) provides, as relevant:

**(b) Disposition on Notice and Hearing**. A criminal contempt shall be initiated on notice, except as provided in subdivision (a) of this rule.

(1) *Content of Notice*. The criminal contempt notice shall:

(A) state the time and place of the hearing;

(B) allow the alleged contemner a reasonable time to prepare a defense; and

(C) state the essential facts constituting the criminal contempt charged and describe it as such.

(2) *Form of Notice*.  The judge shall give the notice orally in open court in the presence of the alleged contemner or by written order, including an arrest order if warranted.  The notice and order may also issue on application of the district attorney general, an attorney appointed by the court for that purpose, or an attorney representing a party in the case.

Tenn. R. Crim. P. 42(b).  As to what constitutes sufficient notice, this Court has explained:

> Sufficient notice meeting the requirements of due process must be given as a prerequisite to a court's authority to punish a party for criminal contempt committed outside the presence of the court.  *Storey v. Storey*, 835 S.W.2d 593, 599-600 (Tenn. Ct. App. 1992).  Under Tenn. R. Crim. P. 42(b), a person facing a criminal contempt charge must "be given explicit notice that they are charged with criminal contempt and must also be informed of the facts giving rise to the charge." *Long v. McAllister-Long*, 221 S.W.3d 1, 13 (Tenn. Ct. App. 2006) (citation omitted).  "Essential facts are those which, at a minimum, (1) allow the accused to glean that he or she is being charged with a crime, rather than being sued by an individual, (2) enable the accused to understand that the object of the charge is punishment—not merely to secure compliance with a previously existing order, and (3) sufficiently aid the accused to determine the nature of the accusation, which encompasses the requirement that the underlying court order allegedly violated by the accused is itself clear and unambiguous." *Id*. at 13-14.

*McLean v. McLean*, No. E2008-02796-COA-R3-CV, 2010 WL 2160752, at *5 (Tenn. Ct. App. May 28, 2010), *no appl. perm. appeal filed*.

> In *McClain*, this Court concluded:

> Upon a thorough review of the record, we determine that Father was not provided with the requisite notice, pursuant to Tennessee Rule of Criminal Procedure 42(b), that he was being charged with criminal contempt for specific violations of the 2015 PPP and was not provided with oral notice by the trial court that he faced possible jail time.  Although Mother's October 2015 motion stated that "contempt may carry jail time of up to 10 days for each charge," she failed to enumerate separate charges for which she sought incarceration and appeared to confuse civil and criminal contempt throughout the motion.  Mother's June 2016 motion did not mention criminal charges at all.  Moreover, the record indicates that the trial court did not give oral notice to Father of possible incarceration until entering the order on contempt in August 2016 and assessing a suspended eight-day sentence

-23-

impermissible for civil contempt. *See Mayer*, 532 S.W.2d at 60 ("There is no such thing as a suspended sentence for civil contempt.").

> We therefore vacate the portion of the trial court's August 5, 2016 order finding Father in contempt and sentencing him to an eight-day suspended sentence. *See, e.g.*, *McLean*, 2010 WL 2160752, at *6 (vacating the trial court's finding of criminal contempt upon determining that the record "raise[d] serious doubts concerning whether [the alleged contemner] clearly understood that the petitions exposed her to incarceration" and that "the trial court failed to provide [the alleged contemner] with proper oral notice about the charges as required by Tenn. R. Crim. P. 42(b)").

*McClain*, 539 S.W.3d at 221.

We find no support for Mother's contention that the Trial Court was obliged to read the criminal contempt charges against her aloud to her. Tenn. R. Crim. P. 42 states that notice may be provided orally or "by written order." The Trial Court entered an order in March 2019 denying Mother's request to have the charges read aloud to her while finding that "the Respondent has been provided the Notices of Criminal Contempt Proceedings, she has knowledge of the criminal charges against her, and the Respondent's counsel is further capable of reading the Second Amended Notice of Criminal Contempt Proceedings to the Respondent." This order, combined with Father's 18-page Second Amended Notice of Criminal Contempt identifying in detail the charges of Mother's alleged contemptuous acts, put Mother on sufficient notice of the criminal contempt charges against her. We further note Mother's testimony that she was aware of her constitutional rights; that she waived those rights; that she faced possible jail time in connection with criminal contempt; and that her attorney had gone over the notice of criminal contempt with her before trial. We are satisfied that Mother received adequate notice of the criminal contempt charges brought against her.

We next address whether the 573 counts of criminal contempt found against Mother were proven beyond a reasonable doubt. Mother argues: "Ultimately this is a case about parental estrangement. Mother cannot be convicted of criminal contempt when Father's own actions and inactions are the root cause of Father's parental estrangement with BC." Mother argues further that the Trial Court wrongly shifted the burden to Mother to produce certain emails she was alleged not to have sent Father in defiance of the parenting plan. This Court has discussed the elements of criminal contempt as follows:

> Tennessee Code Annotated section 29-9-102 authorizes courts to "inflict punishments for contempts of court" for, inter alia, "[t]he willful disobedience or resistance of any officer of the such courts, party, juror,

witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts[.]" Tenn. Code Ann. § 29-9-102(3). In this situation, "[t]here are three essential elements to criminal contempt: '(1) a court order, (2) the defendant's violation of that order, and (3) proof that the defendant willfully violated that order.' " *Pruitt v. Pruitt*, 293 S.W.3d 537, 545 (Tenn. Ct. App. 2008) (citing *Foster v. Foster*, No. M2006-01277-COA-R3-CV, 2007 WL 4530813, at *5 (Tenn. Ct. App. Dec. 20, 2007)). In addition, the plaintiff must show the following four elements: (1) the order allegedly violated was lawful; (2) the order was clear and unambiguous; (3) the individual charged did in fact violate the order; and (4) the individual acted willfully in so violating the order. *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 354-55 (Tenn. 2008); *Furlong v. Furlong*, 370 S.W.3d 329, 336 (Tenn. Ct. App. 2011) (stating that the four-element analysis outlined in *Konvalinka* applies to criminal and civil contempt actions). As this Court has previously explained,

> A person charged with criminal contempt is "presumed innocent and may not be found to be in criminal contempt in the absence of proof beyond a reasonable doubt that they have willfully failed to comply with the court's order." *Long v. McAllister-Long*, 221 S.W.3d 1, 13 (Tenn. Ct. App. 2006) (citing *Black v. Blount*, 938 S.W.2d 394, 398 (Tenn. 1996); *Thigpen v. Thigpen*, 874 S.W.2d 51, 53 (Tenn. Ct. App. 1993)). If the defendant is found guilty by the trial court, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the verdict of guilt. *Black*, 938 S.W.2d at 399. When the sufficiency of the evidence in a criminal contempt case is raised in an appeal, this court must review the record to determine if the evidence in the record supports the finding of fact of guilt beyond a reasonable doubt, and "if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt" we are to set aside the finding of guilt. *See* Tenn. R. App. P. 13(e) (directing that "findings of guilt in criminal actions shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt").

*Pruitt*, 293 S.W.3d at 545-46.

*Mawn v. Tarquinio*, No. M2019-00933-COA-R3-CV, 2020 WL 1491368, at *3 (Tenn. Ct. App. March 27, 2020), *no appl. perm. appeal filed*.

Thus, while a party charged with criminal contempt is presumed innocent, should that party be found guilty by the trial court, that party has the burden on appeal of showing why the evidence is insufficient to establish guilt. Mother has failed to identify a single specific finding of criminal contempt which she contends was not proven beyond a reasonable doubt. Instead, Mother contends in broad terms that she was improperly burdened with producing emails, and that instances of BC not going with Father on his coparenting time was due to estrangement between the two of them rather than anything Mother did. Father testified that Mother failed to regularly send Sunday activity emails as required, and he testified to a number of particular instances where Mother failed to send the appropriate emails. The Trial Court had an evidentiary basis from which to conclude Mother failed to send activity emails as required. With respect to Mother's contention that Father's missed parenting time with BC was due to the child's own estrangement from Father and not Mother's actions, we note the Trial Court's unequivocal credibility determinations against Mother and BC. It was the Trial Court's prerogative to discount their testimony and credit Father's testimony. We also note Mother's testimony that, prior to the March 2017 incident, Father's relationship with BC was "tolerable. The relationship was tolerable because [BC] had to go. I made [BC] go and I told [BC] she had to go." Mother's own testimony suggests she had the ability to abide by the parenting plan with respect to Father's coparenting time but chose not to.

The Trial Court had the benefit of voluminous testimony upon which to base its findings. Against that, Mother points to no contrary evidence pertaining to a specific charge. Mother does not argue, for instance, that on a specific charge for which she was found to be in criminal contempt for failing to send an email as required under the parenting plan, she did in fact send that email, and then point to that email in the record. Mother did attempt to admit some additional emails at trial, which were marked for identification purposes as part of Mother's offer of proof. The Trial Court refused to consider these additional emails, finding they were not properly produced in discovery. Mother does not identify the Trial Court's exclusion of these additional emails as an issue on appeal. In view of these facts, we do not find that the evidence against Mother is insufficient to arise to beyond a reasonable doubt. We affirm the Trial Court as to this issue.

We next address whether Mother's sentence of 200 days in jail and a fine of $28,650 was excessive. Mother argues that her "sentence of 200 days and a fine of over $28,000 was excessive and shocks the [conscience]" and that "[t]o hold Mother criminally liable for the actions of [a] teenager and a strained father/daughter relationship that started when Father had an affair should be overturned where the trial court abused its discretion." To decide this issue, we look to the law on what constitutes an excessive sentence in the criminal contempt context. "Criminal contempt should be imposed in appropriate cases when necessary to prevent actual, direct obstruction of, or interference with, the

administration of justice. Thus, sanctions imposed for criminal contempt generally are both punitive and unconditional." *In re Sneed*, 302 S.W.3d 825, 827-28 (Tenn. 2010) (internal quotation marks and citations omitted). "Although statutory criteria may support the imposition of consecutive sentences, the overall length of the sentence must be 'justly deserved in relation to the seriousness of the offense[s],' Tenn. Code Ann. § 40-35-102(1), and 'no greater than that deserved' under the circumstances, *id*. at § 40-35-103(2). *See also State v. Lane*, 3 S.W.3d 456, 460 (Tenn. 1999)." *Id*. at 828-29. This Court has stated: "[N]ot every contemptuous act, or combination of contemptuous acts, justifies the imposition of a maximum sentence, particularly when consecutive sentencing is in play. Therefore, if we determine that a sentence is excessive, it is incumbent upon this court to reduce or otherwise modify an excessive sentence for contempt." *Simpkins v. Simpkins*, 374 S.W.3d 413, 422 (Tenn. Ct. App. 2012) (citations omitted).

The Trial Court found that "Mother has shown no inclination to follow court Orders"; "[s]he continues to deprive Father of his parenting time, continues to violate the parenting plan with regard to negative treatment to Father, and the failure to provide the appropriate emails"; "[t]his sentence is justly deserved"; and "Mother has not shown the potential for rehabilitation." The evidence supports all of these findings made by the Trial Court. We note Mother's testimony that, to her, a parenting plan is a mere "piece of paper." While the parenting plan was simply a piece of paper in the most reductive, physical sense, it also represented the Trial Court's lawful authority that Mother was bound to obey. Instead, Mother repeatedly flouted and defied the Trial Court. She cut Father off from exercising his parenting time with BC; failed to communicate with Father as required; withheld information from Father; failed to consult Father; failed to give Father BC's telephone number when she got a new phone; and made derogatory remarks about Father in front of the children, all in violation of the parenting plan. There was no ambiguity regarding Mother's duties under the parenting plan, which was a lawful order of the Trial Court.

Mother has shown no respect for the rule of law in this case. Mother's behavior was egregious, and her punishment is justly deserved. We find that Mother's 200-day sentence is not excessive. We further find no abuse of discretion by the Trial Court in its disposition of Mother's criminal contempt proceedings. The Trial Court's use of its contempt power was neither illogical nor unreasonable; had a sufficient evidentiary basis; comported with the applicable law; and was one of multiple acceptable alternatives.

We next address whether the Trial Court erred in finding that parental alienation existed in the absence of a clinical evaluation of either parent or RC and on the basis of unreliable expert testimony. Mother argues: "Dr. Bernet's testimony was unreliable where he provided no professional evaluation or psychological testing of any child or party to this case … This is akin to a medical doctor testifying in a car wreck case to the trier of fact

about what a back injury looks like, and leaving it up to the jury to diagnose the back injury, with no independent expert proof on causation or injury." Mother states further that there was no evidence of alienation as to RC. In her reply brief, Mother asserts: "Dr. Bernet was biased, and in essence, performed a sham diagnosis, and therefore his testimony should be stricken."

Evidentiary rulings are within the discretion of a trial court. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222 (Tenn. Ct. App. 1999). Rule 702 of the Tennessee Rules of Evidence states: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

"[I]t is the responsibility of the trial court to determine that '(1) the witness qualifies as an expert, and (2) the expert's testimony is reliable in that the facts underlying the testimony are trustworthy and the testimony will substantially assist the trier of fact.'" *Potts v. Potts*, No. E2016-02283-COA-R3-CV, 2018 WL 774533, at *10 (Tenn. Ct. App. Feb. 8, 2018), *no appl. perm. appeal filed* (quoting *Freeman v. Blue Ridge Paper Products, Inc.*, 229 S.W.3d 694, 707-08 (Tenn. Ct. App. 2007)). Father cites *McClain v. McClain* as an example of a case in which parental alienation was found to have occurred. In *McClain*, this Court concluded:

> Upon our thorough review of the record, including the four days of testimony heard by the trial court in October 2015 and June 2016, Dr. Schacht's report, and several volumes of exhibits presented at trial, we determine that the evidence does not preponderate against the trial court's finding that the Children had been severely alienated against Mother with that alienation supported by Father. While the trial court found Dr. Schacht's testimony to be highly credible, it found Father's testimony to be often

-28-

characterized by extreme negative generalizations regarding Mother without reasonable bases in fact. The Children's respective testimonies, particularly B.M.'s testimony during the June 2016 trial, mirrored many of these negative generalizations concerning Mother. Father stated his belief that he had attempted to support the relationship between Mother and the Children, but simultaneously, his testimony demonstrated his opinion that Mother could not manage her own behavior or relationships. However, as the trial court noted, the evidence demonstrated that Mother had undergone treatment for and managed her bipolar disorder and was an accomplished, educated professional with a secure living situation.

***

We determine that a material change in circumstance affecting the Children had occurred by the time that Mother filed her action for modification of custody on October 2, 2015. As Dr. Schacht noted, the alienation of the Children from Mother had reached "crisis proportions" by this time. Moreover, B.M. had been admitted to a psychiatric hospital, was enormously angry with Mother for her insistence on exercising her co-parenting time with him, and was feared to be a danger to himself and perhaps Mother. Specific to B.M., the exacerbation of parental alienation and his psychiatric hospitalization constituted a change in circumstances since entry of the 2015 PPP that (1) involved B.M., (2) had arisen after entry of the 2015 PPP, (3) was not reasonably anticipated when the 2015 PPP was entered, and (4) affected B.M.'s well-being. *See Oliver* [*v. Oliver*], [No. M2002-02880-COA-R3-CV,] 2004 WL 892536, at *3 [Tenn. Ct. App. Apr. 26, 2004].

*McClain*, 539 S.W.3d at 203-04.

Mother distinguishes *McClain*, observing that case involved an actual diagnosis of parental alienation based upon direct evidence of alienation, evaluations, and hospitalization of the subject child. In the instant case, there was no diagnosis of parental alienation or evaluation of the children. However, we do not interpret *McClain* to stand for the proposition that expert testimony regarding parental alienation can assist the trier of fact only when there has been an evaluation or diagnosis of the children at issue. Dr. Bernet testified to the phenomenon of parental alienation and stated that the factual scenarios presented to him were consistent with severe parental alienation. Whether one parent actively worked to destroy the children's relationship with the other parent was a subject relevant to the Trial Court's inquiry at hand—namely, making its determination as to whether a material change of circumstance occurred. Respectfully, Mother's 'back

injury in a car wreck' suit analogy is off the mark, not least because this is a post-divorce family matter and not a tort case. Moreover, the Trial Court did not diagnose the children from the bench, *per se*. No such diagnosis was necessary. Rather, the Trial Court heard evidence that Mother behaved in ways consistent with alienation (her disparaging remarks about Father; interfering with Father's parenting time; withholding information from Father, etc.); that BC exhibited signs of being alienated; and, as relevant to our present inquiry, that similar signs were emerging with RC, albeit not yet as pervasively as with BC. Educated thusly on the phenomenon, the Trial Court fashioned a plan geared toward ensuring the children were not subjected to parental alienation. Mother makes no persuasive argument that Dr. Bernet's testimony was unhelpful, untrustworthy, or irrelevant to the Trial Court in its rendering a decision. While Mother refers to Dr. Bernet's testimony as "sham" testimony, she does not identify the sham. We find no reversible error in the Trial Court's admission of Dr. Bernet's testimony. The Trial Court's admission of Dr. Bernet's testimony was neither illogical or unreasonable; had an evidentiary basis; comported with the applicable law; and was an acceptable disposition about which reasonable minds might differ.

We next address whether the Trial Court erred in finding a material change of circumstance as to RC. Mother states that the evidence reflects RC is a happy young boy who participates in sports. Mother argues: "The court's finding that Mother had began to alienate RC from Father is unsupported by the proof and does not equate to a material change of circumstances to warrant modification." Regarding changes to permanent parenting plans, our Supreme Court has stated: "In assessing a petition to modify a permanent parenting plan, the court must first determine if a material change in circumstances has occurred and then apply the 'best interest' factors of section 36-6-106(a)." *Armbrister v. Armbrister*, 414 S.W.3d 685, 697-98 (Tenn. 2013) (citations omitted). This Court has stated:

> Where the issue before the court is a modification of the residential parenting schedule only, the threshold for determining whether there has been a material change of circumstances is much lower as compared to the threshold for modification of the primary residential parent. To modify the residential parenting schedule, a showing that the current schedule is not workable for the parties can be enough to satisfy the material change of circumstances standard.

*Drucker v. Daley*, No. M2019-01264-COA-R3-JV, 2020 WL 6946621, at *6 (Tenn. Ct. App. Nov. 25, 2020), *no appl. perm. appeal filed* (internal quotation marks and citations omitted, footnote omitted). "Trial courts have broad discretion to work out the details of parenting plans." *Id*. at *5 (citing *Armbrister*, 414 S.W.3d at 693). The threshold for changing a residential parenting schedule is quite low. It is sufficient to show that the

current schedule is not workable for the parties. The Trial Court found that "RC is in danger of the same alienation suffered by BC at the hands of Mother." The evidence does not preponderate against this finding. The Trial Court had the benefit of the testimony at trial, including that of RC himself. The Trial Court made its credibility determinations and concluded that Mother's alienating behaviors were beginning to influence RC as evidenced by his testimony. We find, as did the Trial Court, that the early signs of, and risk for, parental alienation with RC sufficiently qualified as a material change of circumstance for purposes of the low threshold applicable to modifications of a residential parenting schedule.

We next address whether the Trial Court erred by failing to conduct a proper best interest analysis for RC. Mother asserts: "[T]he court failed to cogently address these factors in its final order and failed to make sufficient findings of fact regarding the court's best interest analysis and the threshold issues of a material change of circumstances for … RC." The best interest factors are set out by statute as follows:

> (a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:
> (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;
> (2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;
> (3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a) (West July 1, 2016 to June 30, 2021). While trial courts must consider all relevant best interest factors, they need not specifically reference each factor. *See Broadrick v. Broadrick*, No. M2013-02628-COA-R3-CV, 2015 WL 1947186, at *6 (Tenn. Ct. App. Apr. 29, 2015), *no appl. perm. appeal filed* ("Although the trial court

did not specifically reference the best interest factors in Tennessee Code Annotated § 36-6-106(a), its findings demonstrate a consideration of the relevant factors.").

Mother argues that with respect to factor (1), RC testified he has a good time with Mother and gets along with his stepfather; with respect to factor (2), that Mother's ability to perform her parenting duties with RC is not in question; factor (4), Mother describes as a "non-issue" because both parents provide for RC and Mother is the primary educational parent for RC allowing RC to go to school in Georgia; factor (5), that while Father is the primary residential parent of RC, Mother has parented him as well; factor (6), that RC testified he is afraid of Father, understood Mother loves him, and has never refused to go with either parent; factor (7), that the Trial Court made no finding as to RC other than the parental alienation process has begun with him; factor (8), that RC has heard Father speak badly of Mother; factor (9), that RC testified he did not like his stepmother because she yells a lot and he does not get along with the stepmother's son; factor (10), that RC testified he felt rushed at Father's house because it takes longer to get to school; and factor (13), that RC testified he would like to spend more time with Mother because he is somewhat afraid of Father.

While the Trial Court's findings principally centered on BC, many of the Trial Court's findings apply with equal felicity to RC. Specifically, the Trial Court's finding that Mother currently is "emotionally unfit to parent" extends to RC. Mother's destructive behavior in regard to the children's relations with Father, amply reflected by the evidence from trial, implicates factors (2), (6), (7), (9), and (11), at least. With respect to factor (13), the Trial Court was not obliged to accept RC's stated preference. The Trial Court found that RC's testimony appeared to be influenced by Mother. The Trial Court's concern that Mother is leading RC down the same road she led BC down, of denigrating Father and discouraging a healthy familial relationship, is justified and outweighs the factors relied upon by Mother. The evidence does not preponderate against any of the Trial Court's factual findings relative to this issue. In addition, no clear and convincing evidence exists in this record that would serve to overturn the Trial Court's credibility determinations. We find no reversible error in the Trial Court's best interest determination regarding RC and subsequent reduction of his time with Mother. In arriving at the details of RC's parenting plan, the Trial Court did not make an illogical or unreasonable decision; made findings in accordance with the relevant statutory factors and applicable law; had evidentiary support for its decision; and reached one of multiple, acceptable alternative dispositions. In short, the Trial Court did not abuse its discretion.

We next address whether the Trial Court erred in dismissing Mother's post-trial petition for modification. On this issue, Mother points out that the standard for motions to dismiss brought pursuant to Tenn. R. Civ. P. 12.02(6) is quite stringent. Our Supreme Court has discussed the applicable standard as follows:

A Rule 12.02(6) motion challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence. The resolution of a 12.02(6) motion to dismiss is determined by an examination of the pleadings alone. A defendant who files a motion to dismiss admits the truth of all of the relevant and material allegations contained in the complaint, but ... asserts that the allegations fail to establish a cause of action.

In considering a motion to dismiss, courts must construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences. A trial court should grant a motion to dismiss only when it appears that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief. We review the trial court's legal conclusions regarding the adequacy of the complaint de novo.

*Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011) (internal quotation marks and citations omitted).

The Trial Court found, in part, that "Mom's conduct cannot create the material change and ask for relief from a court order that she does not intend to follow." We agree with the Trial Court that Mother's seemingly interminable defiance of court orders cannot serve as the basis for a material change of circumstance. Mother also cannot overcome Father's motion to dismiss simply by attempting to relitigate the most recent custody order. Upon our *de novo* review of this motion to dismiss, Mother failed to allege a genuine material change of circumstance. We affirm the Trial Court in its dismissal of Mother's petition for modification. However, Mother is not precluded from filing a new petition for modification going forward.

The final issue of Mother's we address is whether the Trial Court abused its discretion in granting Father attorney's fees. Tenn. Code Ann. § 36-5-103(c) authorizes a court to award reasonable attorney's fees to a "prevailing party" in a child custody case such as this. The applicable standard of review is that of abuse of discretion. *Eberbach v. Eberbach*, 535 S.W.3d 467, 475 (Tenn. 2017). Father prevailed below. However, Mother asserts, without citing any evidence, that she lacks the ability to pay an award of attorney's fees. The record suggests otherwise. At trial, Mother testified she is Vice President of marketing and sales for Smoky Mountain Wood Products. Mother co-owns the business with her husband. Mother testified that she earned $38,000 to $42,000 in 2018. Mother's tax preparer testified Mother's income was some $76,000. There is additional evidence in the record that Mother and her husband have purchased horse trailers and a power unit costing over $260,000. Based upon this record, we are unpersuaded that Mother lacks the

-34-

ability to pay. The Trial Court's decision as to attorney's fees was logical; in accordance with the governing law; supported by the evidence; and one upon which reasonable minds could differ, while being within the range of reasonable discretionary outcomes. We affirm the Trial Court in its award to Father of his attorney's fees and expenses.

The final issue we address is Father's issue of whether he should be awarded his attorney's fees incurred in this appeal. "In determining whether an award of attorney's fees is warranted, this Court should consider, among other factors, the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered." *Baxter v. Rowan*, 620 S.W.3d 889, 897-98 (Tenn. Ct. App. 2020) (internal quotation marks and citations omitted). Mother requests that we exercise our discretion and "deny [Father's] request based on the novel issues presented within this case, and Father's ability to afford his attorney's fees versus Mother's inability to afford her own expenses." We find Mother's argument unavailing. Father has prevailed on appeal in full. Mother's contention that she is unable to pay an award of attorney's fees lacks support. Pursuant to Tenn. Code Ann. § 36-5-103(c), and in the exercise of our discretion upon consideration of the equitable factors, we find that Father is entitled to an award of attorney's fees incurred defending this appeal. On remand, the Trial Court is to award Father his reasonable attorney's fees incurred on appeal.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below and further proceedings consistent with this Opinion. The costs on appeal are assessed against the Appellant, Amanda Kaye Choate (Ralston).

_____
D. MICHAEL SWINEY, CHIEF JUDGE